**VISKASE CORPORATION, Plaintiff,**

**v.**

**AMERICAN NATIONAL CAN COMPANY, Defendant.**

**No. 93 C 7651.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1997.

Roy E. Hofer, William H. Frankel, Robert W. Stevenson, Allan J. Sternstein, Andrew D. Stover, Brinks, Hofer, Gilson & Lione, Chicago, IL, David I. Herbst, Allan S. Brilliant, Harold David Israel, Holleb & Coff, Chicago, IL, for Plaintiff.

Jeffrey D. Colman, William Denby Heinz, Barry Levenstam, Jenner & Block, Chicago, IL, Harry J. Roper, Steven Raymond Trybus, Sarah Lynn Taylor, Roper & Quigg, Chicago, IL, Douglas W. Wyatt, Thomas A. O'Rourke, Frederick J. Dorchak, Joseph C. Kirincich, John C. Todaro, Wyatt, Gerber, Burke & Badie, New York, NY, for Defendant.

***MEMORANDUM OPINION AND ORDER***

BUCKLO, District Judge.

A jury awarded Viskase Corporation $102,384,681 in damages for infringement of plaintiff's patents. The jury ruled that the infringement was willful. Viskase now asks that I award treble damages and attorneys' fees based on the finding of willfulness. American National Can Company (ANC), the defendant, seeks judgment notwithstanding the verdict or a new trial on various grounds. The various motions are considered in this opinion.

*Background*

The patents in this case all relate to heat-shrinkable, biaxially-stretched films made with very low density polyethylene (VLDPE) or a process for making these films. These films are used to package a variety of food articles, including primal meat cuts, frozen poultry and processed meat products. ANC makes films using two types of polyethylene resin manufactured by the Dow Chemical Company under the names Attane and Affinity. Prior to trial I ruled that ANC's films made from the Attane resin and the process for making those films infringed all of the asserted patents owned by plaintiff Viskase Corporation (Viskase). The jury was instructed to determine whether ANC's films made with Dow's Affinity resin violated Viskase's patent rights, whether ANC had acted willfully with respect to either the Attane or Affinity films, damages for infringement by the Attane films and, if infringement was found, damages resulting from the manufacture of the Affinity films. As indicated above, the jury found in Viskase's favor on all issues, and awarded $102,384,681 in damages.

The basic issue in this case is whether ANC's films infringe Viskase's patents, which claim a film "comprising a very low density polyethylene which is a linear copolymer of ethylene and higher alpha olefin containing from 3 to 8 carbon atoms having a density below about 0.91 g/cm3, a 1% secant modulus below about 140,000 kPa, and said film being formed using a double bubble method...." Claim 1, U.S.Patent No. 4,863,769. The parties agree that "linear" means without significant long chain branching per 10,000 carbon atoms. The parties disagree over what is significant. Viskase argues that "significant" means great enough to affect density. ANC argues that the term means that there are

enough long chain branches to affect the rheological properties of the copolymer. Each party presented its position, through experts, at trial.

At trial, Dr. Roger Porter, a professor of chemistry at the University of Massachusetts and Viskase's expert on polyethylenes, testified that a polymer would be linear if it had a few, i.e., about one, long chain branch per 10,000 carbon atoms, and that the amount of long chain branching in Affinity was below that level. He testified that he arrived at this conclusion based on tests on the Affinity PL–1840 resin run at a laboratory called Jordi Associates. No one from Jordi testified. Dr. Porter was allowed, however, based on his admitted expertise in this area, to base his opinion on the tests. See Fed. R.Evid. 703; *Finchum v. Ford Motor Co.*, 57 F.3d 526, 532 (7th Cir.1995); *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir.1990); *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1271 (7th Cir.1988). Dr. Porter also testified about the tests, saying he had supervised and observed them, drawing his own opinion from the computerized data generated by Jordi Associates following its analysis of samples of the Affinity resin. Specifically, Dr. Porter testified that the amount of long chain branching found in Affinity PL–1840 (based on his conclusions from the data provided him by Jordi Associates) was lower than the amount of long chain branching found in accepted linear polyethyenes, including the National Bureau of Standards linear polyethylene. ANC's expert, Dr. Quirk, agreed that Affinity PL–1840 had only 0.8 long chain branches per 10,000 carbon atoms (less than that found on the National Bureau of Standards linear polyethylene). ANC argued that Dr. Porter's approach was wrong, and that even he conceded that even small amounts of long chain branching could have a significant effect on the rheological or melt properties of a polymer. Dr. Karjala, a Dow chemical research engineer, testified for ANC that the ANC films, made with the Dow Affinity PL–1840 resin, had rheological qualities that were different from a linear polymer, and that the different rheological qualities could only be accounted for by significant long chain branching. In rebuttal, Dr. Porter testified that the rheological properties of Affinity were attributable to differences in molecular weight distribution and not long chain branching. Dr. Porter also attempted to show that Dow's Rheology Index, relied on by Dr. Karjala, was scientifically unsound. Thus, the jury essentially had to decide first, whether to use a numerical or rheological test to determine "significant" levels of long chain branching, and then to determine, under whichever test it thought correct, whether films made with the Affinity resin had significant levels of long chain branching.

*Sufficiency of the Evidence*

Following the verdict in favor of Viskase, ANC, within its allotted time, filed motions pursuant to Fed.R.Civ.P. Rule 50 for judgment as a matter of law and Rule 59 for a new trial or to alter or amend judgment. In those motions ANC argues that the evidence presented by Viskase was insufficient as a matter of law. In essence, however, ANC's argument is that this court must accept, as a matter of law, its rheological theory of long chain branching. Having heard the evidence, and reread much of the transcript, I cannot agree. Neither party presented convincing evidence that its test for long chain branching is the only acceptable test used by experts in the field. Dow's test of rheological qualities may or may not be sound; it is obviously self-serving. The clearest point to come from the evidence was that the existence of long chain branching per 10,000 carbon atoms at the levels that are at issue in this case is detectable only by very sophisticated equipment, if at all. Viewing the evidence in the light most favorable to Viskase, and drawing all reasonable inferences in Viskase's favor, ANC has not satisfied its burden under either Rule 50 or 59, Fed.R.Civ.P.

*False Testimony by Viskase's Expert*

The second question, however, is whether evidence presented post-trial with respect to Dr. Roger Porter should alter this conclusion. Shortly before I was to rule on the post-trial motions, ANC discovered that it might not have had all of the documents seen by Viskase's expert, Dr. Porter, at the time

of trial and that certain numbers allegedly relied upon by Dr. Porter in forming his opinion with respect to infringement might have been altered. Following a hearing in which I concluded that the discovery that had not been provided had been within the scope of defendant's discovery requests, and that the allegations of altered documents were serious enough that I could not determine without more information that they might not have affected the outcome of this case, I agreed to allow ANC to take the deposition of the person who reportedly claimed, contrary to trial testimony, to have performed certain tests. That deposition appeared to confirm ANC's suspicions, if what the deponent said was true. I suggested that if Viskase wanted to clarify the matter that it take depositions of personnel at the testing laboratory who could confirm or deny the apparently conflicting testimony with regard to altered documents. Viskase agreed and took several depositions. ANC has since filed a supplemental motion arguing that Viskase not only did not produce relevant documents before trial but that Dr. Porter testified falsely at trial regarding the tests upon which his opinion regarding infringement of the Affinity films was based.

ANC's motion based on newly discovered evidence was not presented until the time for filing post-trial motions had expired. It must therefore be examined under Rule 60, Fed.R.Civ.P. Rule 60(b)(2) requires that a litigant seeking relief from judgment pursuant to newly discovered evidence show

> (1) The evidence was discovered following the trial; (2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is such that a new trial would probably produce a new result.

*United States v. Walus,* 616 F.2d 283, 287–88 (7th Cir.1980). Under Rule 60(b)(3), however, in cases in which a court or jury is presented with perjured testimony which is relevant and material to the issues decided, the requirements are slightly different. *Fraige v. American–National Watermattress Corp.,* 996 F.2d 295, 299 (Fed.Cir.1993). In such cases the court should not attempt to weigh the effect of the perjured testimony on the trier of fact and should instead order a new trial. *Id.*

The applicability of the appropriate rule in the present case requires a detailed consideration of Dr. Porter's testimony. After stating his background, Dr. Porter began his testimony by explaining to the jury the basic chemistry involved in as well as some history of polyethylenes and the relationship of long chain branching to linear polyethylenes. He also discussed an analysis of long chain branching in a linear polymer at the National Bureau of Standards. Dr. Porter then explained that there were two principal testing techniques for determining long chain branching. The first was magnetic resonance imaging (an MRI, with which the jury may well have been familiar), but Dr. Porter said this test would have limited ability to detect the level of long chain branching at issue in this litigation. The second method was gel permeation chromatography or GPC–DV testing. Dr. Porter explained the test and testified that it was very accurate.

At this point in his testimony, Dr. Porter was asked whether he supervised any GPC–DV tests on the Affinity PL 1840 resin. He stated that he did. (Tr. 285) After stating that this test was better than the other test he had mentioned, he stated that his recommendation was that they use the best GPC–DV testing available in the United States. Dr. Porter was again asked if he supervised tests on Affinity PL 1840, and he again said yes. (Tr. 286) In response to a question as to where he supervised these tests, Dr. Porter stated that he wanted an outside independent evaluation of any long chain branching that might be in Affinity, and that he chose Jordi Associates. He was again asked if he supervised these tests. After stating "yes" a third time (Tr. 288), Viskase attempted to move into evidence a document described as "the testing that you supervised at Jordi Associates." (Tr. 288). ANC objected on hearsay grounds. Viskase counsel attempted to lay a foundation, asking Dr. Porter whether he was "there when the tests described in this Viskase Trial Exhibit No. 167 were per-

formed?" (Tr. 288) Dr. Porter responded as follows:

> A. Yes. I believe this was the second visit. I drove some distance to go there, and I asked to be present while the injections were made. The column was eluted, the detector responded. But I also asked to leave, and I asked them to send me, without my previous notification, what their results were so that there would be no indication that I in any way would influence the results that were to be presented.

(Tr. 288–89)

Following this testimony, Viskase again sought admission of the test results. I sustained ANC's objection. Dr. Porter again testified that he observed the testing at Jordi Associates (Tr. 291 and 292), that he was there when the tests were done, that he was there when the samples were prepared, and when they were injected, and when they eluded from the GPCDV. (Tr. 292) Following another objection, Dr. Porter testified as follows:

> Well, I'll just speak the truth, your Honor. This was faxed to me after I left, and I asked that that be done because I did not want to be looking over their shoulders at the time they did the computation, plain and simple, in the interest of objectivity and honesty.

(Tr. 293)

Dr. Porter was then asked if he calculated long chain branching in Affinity PL–1840 based on the results he obtained from the Jordi testing. ANC objected that no such documentation had been provided them. Dr. Porter was again asked whether he observed the results of the Jordi testing while he was at Jordi. Dr. Porter responded that he saw the samples elude from the columns and saw the detector responses and base line return. He added, "I saw the stability of the base line. I saw the recorder of the two detector outputs and saw the information entered into their software computer program." (Tr. 299) Dr. Porter was then asked what level of long chain branching he observed, to which he answered that he saw no detectable level. (Tr. 300) He was essentially asked the same question, and gave the same response "based upon our observations at Jordi Associates" a minute later. (Tr. 301) Dr. Porter compared the level of long chain branching that he "saw" with the level detected on the National Bureau of Standards sample, and testified that the Affinity resin was linear.

Following this testimony, Dr. Porter testified about the various ANC products and the fact that they infringed Viskase's patents due to the absence of long chain branching in the resin.

On cross examination, Dr. Porter again was asked to describe what he saw. He responded that

> with Dr. Wong, I asked him to make up the solution and do the injections and watch the recorder trace over time.... So we make up solutions carefully. I watched that process. That has to be truly in solution, and we have to be very careful we don't degrade the material because you have to dissolve it at high temperature, and you have to put antioxidant in the polyethylene to make sure you are getting the right answer. Then after a period of time, it can be minutes to an hour or so, then with a hypodermic syringe or other device, you withdraw a sample and inject it into the gel permeation chromatograph when the base line is stable. I watch the base line stability, and that is very important for precise determination. So the base line was stable in the recorder charts, and I watched that.

(Tr. 339)

At this point in the cross-examination, ANC referred to the report from Jordi Associates that I had not allowed in evidence, asking Dr. Porter about the fact that the report had said "maybe" the Affinity resin had long branching. Dr. Porter was further referred to the part of the report that in fact stated that in order to correctly determine whether the samples were linear or branched, full statistical analysis would be required. Dr. Porter admitted that he did not do such an analysis.

At a conference before trial began on the following morning, responding to a suggestion made by me the day before that a solution to the hearsay problems of the Jordi

testing exhibit could be to bring in someone from Jordi, Viskase reported that no one from Jordi would be able to testify. Counsel from Viskase (Mr. Frankel) stated, however, that "in terms of the actual tests, Dr. Porter was present from start to finish." (Tr. 371) After discussion, I again ruled that the Jordi report itself could not be put in evidence without a foundation from Jordi, but that Dr. Porter could state his opinion based on the testing if it had been established that the report was the kind reasonably relied upon by experts.

On redirect, Viskase counsel asked Dr. Porter "when the sample is injected and the trace comes out and the data go into the computer, is there any intervention possible by you or Jordi at that point?" (Tr. 389) Dr. Porter answered, "No intervention is possible, and they have extensive experience in running branching determinations, so we use their standard protocol." (Tr. 389) Dr. Porter then reiterated once more that he was present during the testing, adding

> There are certain things that one can actually see by eye. As I mentioned earlier, it's hypersensitive to temperature and other variations. So I could watch the recorded baseline to see if it was stable by my previous experience of having run hundreds of GPC in companies and at university. So I was aware of the sensitivity, I was aware of the standards they had run, and the perspective in which these determinations were made.

(Tr. 390–91)

On redirect examination, Dr. Porter was also asked about the fact that the Jordi report had indicated that the Affinity resins might be branched. Dr. Porter explained that he wanted to know what Jordi thought about the alpha values coming out of the computer, and that he had come to a different conclusion. Both on redirect and recross, Dr. Porter was asked about the correlation between alpha values and long chain branching.

The post-trial depositions of Jordi employees and principals established that much of what I have quoted from Dr. Porter's testimony is false.[1] All of the Jordi people agreed that Dr. Porter was not present for any of the testing to which he testified at trial.[2] Neither was the testing done by Dr. Wang (described above by Dr. Porter as "Dr. Wong") who would ordinarily have been the person at Jordi to do the tests. During the summer in which Dr. Porter wanted the tests done, Dr. Wang was away. No one else at Jordi was capable of doing these tests so Jordi brought in an outsider, Trevor Havard. Mr. Havard performed the tests at Jordi and then took the computer home and made the report. His report was sent to Dr. Porter. Dr. Porter believed Mr. Havard had set an erroneous baseline and asked that it be changed. Mr. Havard would not make any change but everyone at Jordi agreed that Mr. Havard had made an error.[3] When Dr. Wang returned he was able to correct the error, and the tests were recalculated. With input from Dr. Porter as to the style in which he wanted the final report (some reports of samples of other resins were removed), a final report was prepared and sent to Dr. Porter. The alpha values in the final report for Affinity were not changed with respect to one of the two samples. The alpha value of the second sample changed by virtue of the recalculation from .627 to .638.

Turning to the criteria for granting a motion for a new trial under Fed.R.Civ.P. 60, there is no dispute that the evidence, namely the false testimony by Dr. Porter, the draft

1. According to my count, Dr. Porter lied at least 15 times during trial as well as in a post-trial affidavit submitted to try to prevent the discovery of his misdeed.

2. Viskase concedes that Dr. Porter was not present at the tests he stated he supervised although it says he "may" have been at a subsequent test. Even this statement is based on testimony by one Jordi employee who thought Dr. Porter might have been looking over his shoulder at sometime when he was looking at his computer. Assuming the employee's vague recollection was correct, no one argues that what Dr. Porter was observing was the test he testified about in court. Furthermore, from the evidence as well as my observation of Dr. Porter at trial, it is clear that Dr. Porter could not have simply been mistaken in his memory.

3. It was Mr. Havard who informed someone at Dow, following the verdict in this case, that he thought his report had been altered.

report done by Mr. Havard, Dr. Porter's notes, and tests comparing Affinity and Viskase's resin, Exxon Exact, were not discovered until trial was over. Viskase argues that ANC did not use due diligence to discover the new evidence because it did not take the deposition of anyone at Jordi Associates, despite receiving the Jordi report upon which Dr. Porter relied at trial, and knowing from Dr. Porter's deposition that Dr. Porter would rely on it. ANC responds that it knew the report was hearsay and so did not bother taking depositions. ANC also says if it had seen the draft reports (which I previously found were within the scope of ANC's discovery requests to Viskase), it would have taken depositions of Jordi personnel, which would have uncovered the change made in the report (and indeed, that if it had the draft report it would have seen the change). Frankly, I am doubtful, given my knowledge of the sloppy discovery practice that ANC engaged in in this case[4], that receipt of a draft that was somewhat different from the final report would have resulted in ANC taking additional discovery. If reliance on the fact that the Jordi report was hearsay as presented by Dr. Porter and ANC's belief that it therefore need not bother with discovery (assuming I guess that Viskase would not bring anyone from Jordi to testify at trial) is really the reason ANC did not take Jordi discovery, it certainly is not clear that it would have done anything differently with more documents. The Jordi report that ANC received during discovery listed the alpha value of one sample of Affinity resin at a level below that considered linear in several sources. Furthermore, under a heading asking whether particular resins were found to be branched, the writer of the report had stated "maybe" as to both of the Affinity samples. In addition, the discovery that ANC received, in addition to the Jordi report itself, included a report dated September 15, 1994, from a Mr. Wickett, also from Jordi Associates. That analysis specifically differentiated a Waters Model 150C chromatograph from "the one used for the job dated 7/24/94," and measured molecular weights in Affinity samples. ANC now says the results obtained by Wickett "were significantly below generally recognized values for that polymer." Defendant's Supplemental Memorandum of Post-Trial Discovery and In Support of Its Motion for JMOL, dated June 12, 1997, at 7. If these red herrings did not induce ANC to be interested in pursuing the source of the Jordi report, it seems questionable that a change in a draft from .627 to .638 in alpha values (both below the level that ANC claimed was the cut-off for linear polyethylenes) would make much difference.

But I cannot be sure of that. ANC had a right to the discovery it sought. Clearly, the Jordi Associates' documents, and those sent to Dr. Porter by Jordi (which included the draft report) were within the control of Viskase. Indeed, in ANC's discovery requests, Viskase specifically was defined to include any "consultants." In these circumstances, courts have held that a party has the right to assume that discovery responses are accurate and complete. *E.g., Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1201 (3d Cir.1989). Furthermore, some of the missing documents compared the two resins used by the parties. With regard to those tests, commissioned by Dr. Porter in May 1995, Dr. Porter testified at his deposition that he had never done such a comparison. I conclude that Viskase should not be able to benefit from ANC's failure to vigorously pursue discovery under these circumstances.

The next two requirements for relief pursuant to Rule 60, that the new evidence is not merely cumulative or impeaching, and that it is material, may be considered together. There are two types of evidence at issue here, the missing documents and the false trial testimony. The documents themselves would have been useful principally for impeachment purposes.[5] Thus the principal

4. Orders entered before trial dealt with various issues that arose from ANC's failure to pursue timely discovery.

5. The parties differ over the significance of the difference between a .627 and a .638 alpha value, which is the principal difference between the draft Jordi report and the report produced to ANC. With regard to the molecular weight comparisons between Affinity and the Exxon resin, as Viskase points out, nothing prevented ANC from making such a comparison.

question is whether Dr. Porter's false trial testimony with respect to his participation in the Jordi tests was material.

ANC argues that the fact that Dr. Porter was not actually present at the tests relied on by him at trial was material because he would not otherwise have been allowed to testify about the results of the tests. Viskase counters that Fed.R.Evid. 703 allows an expert to testify to his opinion even if the underlying data are not admissible. Rule 703 does allow an expert's opinion, even though based on inadmissible data, so long as the facts relied on by the expert are of the type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." The initial problem in this case was that Viskase attempted to introduce Dr. Porter's opinion through the introduction of the Jordi report, which Viskase attempted to authenticate by testimony that Dr. Porter had actually supervised tests. For much of Dr. Porter's testimony, Viskase attempted to introduce the actual results based entirely on reliance of the supposed fact that Dr. Porter had personally supervised the tests. In fact, Viskase might have avoided the issue by asking for Dr. Porter's opinion, ascertaining that it was based on tests that he commissioned, and that those tests were the type of tests reasonably relied upon by experts in his field. *E.g., Nachtsheim,* 847 F.2d at 1270. I say "might," because Dr. Porter testified that the testing was "hypersensitive" (*e.g.,* Tr. 390–91) and he generally testified that the persons doing the testing required considerable training. (*e.g.,* Tr. 391) Thus, it would appear that experts in Dr. Porter's field would not rely on GPC testing without knowledge of who had done the testing. Still he might have testified that he was satisfied that Jordi Associates did have the requisite training and that, based on his knowledge of the kind of work they did, experts in his field would rely on their tests. This would have been a sufficient basis upon which Dr. Porter could have rendered his opinion. At that point, with leave of court, Dr. Porter might have been able to testify to the information contained in the Jordi report, even though it was otherwise inadmissible hearsay. *Id.* at 1271.

But Viskase did not directly pursue this route. Instead, it sought to demonstrate the reliability of the Jordi testing through testimony of Dr. Porter's direct involvement in that test. Because that was the foundation upon which it sought admission of the basis for Dr. Porter's opinion, his testimony is material.[6] It is material in a second respect also. I described Dr. Porter's testimony in some detail above not only to illustrate the number of times he testified falsely during the course of his testimony but also to attempt to provide some sense of that testimony. Dr. Porter's repeated statements of his personal involvement may well have influenced the jury in deciding whether to credit his testimony, and theory, over ANC's theory of significant long chain branching. Contrary to Viskase's argument in the present motion, Viskase offered almost no other testimony that would support its claim that Affinity is a linear polyethylene. Dr. Porter's testimony was the central part of Viskase's infringement case with respect to the Affinity films.

The last requirement under Rule 60(b)(2) is that the evidence would probably have produced a new result. *Walus,* 616 F.2d at 288. This requirement, as noted earlier, does not exist under Rule 60(b)(3). I cannot say whether if Dr. Porter had testified truthfully the outcome would have been different. It makes no difference. It might have been different and since I conclude his testimony was materially false, ANC has satisfied its burden under Rule 60(b)(3), Fed.R.Civ.P.

Viskase nevertheless argues that even if Dr. Porter testified falsely, under *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826 (7th Cir.1985), it cannot be held responsible for the testimony of an outside expert. The court in *Metlyn* upheld the district court's

6. It appears from the record that Viskase did not directly ask Dr. Porter until redirect, over ANC's objection, whether the tests were the type reasonably relied upon by experts in the field. (Tr. 393) Prior to dealing with the specific Jordi test, Viskase did on direct elicit testimony that this was one of two tests used and that this type of test was the more reliable. Thus, it probably introduced sufficient evidence upon which to base an opinion. But when he turned to the specific test at Jordi Associates, Dr. Porter's entire testimony was based on his alleged personal participation.

decision not to reopen a judgment entered on a settlement more than a year after the judgment became final, where it was found that an expert had testified falsely about some matters, including his credentials. But as ANC argues, in that case the district judge had approved a settlement, and after holding a hearing on the newly discovered evidence concluded that he would have nevertheless approved the settlement. That is far different from considering the impact of false testimony from the party's main witness on a jury. Furthermore, Viskase agrees that it would be bound by an expert's false testimony if it or its attorneys knew the testimony was false. While it is not possible to know in this case whether Viskase's counsel knew that Dr. Porter was not present at the tests that led to the Jordi report, they surely knew there must have been additional documents and that there were additional tests conducted. Both the invoices directed to Viskase counsel and Dr. Porter's notes document counsel's knowledge of these facts. I conclude that Viskase cannot escape responsibility for Dr. Porter's testimony.

Finally, Rule 60(b)(6) allows relief from judgment for "any other reason justifying relief." The verdict that is the subject of this motion was in excess of $100 million dollars. For all that a final judgment is desirable for parties and courts alike, a $100 million dollar judgment should not be based on the record that has come to light in this case.

*Damages*

Dr. Porter's testimony was relevant solely to the Affinity based films. I had previously granted Viskase's motion for summary judgment against ANC on films made with the Attane resin. The jury decided Viskase's damages resulting from infringement of the Attane films as well as the issue of willfulness. I will consider the damages issue first.

Viskase argues that damages for infringement of the Attane and Affinity based films can be separated. Unfortunately, while Viskase's damage expert did opine on the damages as a result of each act of infringement, the jury was asked to and did render only one general damage verdict. Thus, damages will have to be retried.[7]

*Willfulness*

ANC also argues that there was insufficient evidence to support the jury's verdict, based on clear and convincing evidence, of willfulness. Based on my conclusions above, the verdict of willfulness as it pertains to the Affinity based films must be vacated. However, the evidence fully supports the jury's verdict of willfulness with respect to the Attane resin films. In support of its argument as to what the parties have called the "First Family Patents," ANC refers to the testimony of its outside patent counsel, Thomas A. O'Rourke, who testified that he provided an oral opinion that the '769 patent was invalid and not infringed in 1989 or 1990. As ANC argues, Mr. O'Rourke's testimony was corroborated by ANC's in-house counsel, Mary Schnurr, and ANC Vice President Gary Falkenstein. However, all of this testimony was impeached. For example, the testimony by Messrs. O'Rourke and Falkenstein about an oral opinion in 1989–1990 was supposedly given at a meeting attended by nearly a dozen people of which there is no record. Furthermore, ANC actually ordered the file histories on Viskase's patents some two years after the alleged oral opinion. In addition, numerous ANC documents showed, contrary to the testimony relied on by ANC, that it was actually quite concerned that it was infringing Viskase's patents, that there was not much prior art, and that Mr. O'Rourke deferred rendering a written opinion until he could find support for a non-infringement position. The jury was entitled to believe that ANC's witnesses were not telling the truth and that in fact ANC proceeded to make products infringing Viskase's "First Family" of patents in willful disregard of Viskase's patent rights. The jury could also find willful infringement of Viskase's "Second Family" of patents from the admis-

7. I do, however, reject ANC's argument that, in the absence of the misconduct discussed in this opinion, the damage award would have to be vacated on the ground that it was excessive or otherwise improper. The jury was entitled to credit the opinion of Viskase's damage expert and to discredit that of ANC's expert.

sion by Mr. Falkenstein that he knew in 1990 that Viskase had received a patent on a three-layer film containing the same ingredients from which ANC made its three-layer film and that he neither read the patent nor asked for an opinion from patent counsel. Although ANC did eventually receive a written opinion, it was not until after this litigation had begun. The jury was entitled to give this little weight in deciding whether ANC's infringement was willful.

Both parties raise numerous additional issues concerning treble damages, attorneys' fees and costs. In view of my disposition of the motions discussed in this opinion, these motions are either moot or premature.

***Conclusion***

For the reasons stated in this opinion, ANC's motion for a new trial on infringement as it relates to Affinity based films, willful infringement with respect to these films, and damages on all of Viskase's claims is granted. Dr. Porter will not be allowed to testify at the new trial.

